The first case is RHC Operating LLC v. New York Hotel & Motel Trades et al. So, I see the lawyers are here. Ms. Carey, you reserve two minutes for rebuttal. So that gives you eight minutes out of the gate. And just give me a second to collect my stuff, and I think we're ready to go. You may proceed. May it please the court. My name is Christine Carey. I represent the appellant RHC Operating LLC, the owner of the Roosevelt Hotel, who is respectfully requesting that this court vacate an arbitration award where the arbitrator and subsequently the district court ignored an on-point Supreme Court decision. The award should be vacated for two reasons. First, it violates the distinction between permissible and mandatory, permissive, and mandatory subjects of bargaining that is inherent in the National Labor Relations Act. And second, the award modifies, rewrites, and holds contrary to Article 57 of the party's collective bargaining. Before we go there, do you suggest that the arbitrator had no authority to impose any kind of discovery sanction? Well, let me put it this way. Did the arbitrator have any authority to order you to produce documents and information? Yes. Yes, Judge Sullivan. We don't deny that he did. Okay. So that's my first question. The second question is, does the arbitrator then have the authority to impose sanctions for noncompliance with such an order? Yes, but not one that violates the party's plain language of their written agreement, which here the remedy that he imposed we believe contradicts that language. So can I ask, though, if you accept that it was within the authority to ask for discovery, then why are we in the permissive, nonpermissive space? Like, I mean, if they're permissive, then why are we having a debate over whether or not this violated public policy? So because it's permissive, they are entitled to, in fact, ask, but then we have the right to decline. And when the award found that we then violated our duty to produce and then ordered us to produce, those findings and that remedy is itself what violates the distinction between permissive and mandatory subjects. But don't they need those documents to decide what they ask for? And I think that that might be where the disconnect is happening. It's not just are they entitled to the documents, are they entitled to bargain over what happens to them. They don't even know what they should be bargaining for or whether or not it falls into the scope of in the agreement, not in the agreement, if they don't have the documents to know what's going on. Well, so there was no decision made with respect to the future of the hotel and. Well, but that's your representation right now. I think the question was, was whether or not the I.C. was within the authority of letting them test that with documents. So the RFIs don't actually go to that proposition that they are testing whether a decision had actually been made. There are many RFIs that state we're seeking Indian Isle documents and communications about a potential sale, a potential transfer, a potential future use. Well, those might be relevant to determining whether in fact such an agreement was reached at the time they closed the hotel, right? I mean, it may lead nowhere, but it seems like it's looking backwards. So it's documents in the last six months, and those documents may show that there's already a deal in the works, and they may not show that, but that can be debated later. But the point is, why is the union not entitled to these documents? Because they're only entitled to documents. They're only entitled to access type of information for effects bargaining, and there were no effects here when there had not been a decision made. But they don't know whether a decision hasn't been made, right? That's the point. I mean, I guess this is to see whether or not this is all a subterfuge, that a deal was already cut, and they're being basically kept down. They're kept in the dark. So if that is a concern, if you want to consider that one of the benefits to making this a mandatory subject of bargaining in the first national test, we propose that there are alternative, less intrusive means. Like what? If there's a potential sale or transfer, that's going to appear in a land records transaction. Those are public documents. They're not going to get around. We're not going to get around our obligation to tell them when a decision has actually been made. Indeed, there is an obligation on us once a decision has been made to actually inform the union. And then if we don't inform them, an alternative remedy exists for them to then pursue that. If we don't timely tell them, then they can bring that itself as an unfair labor practice. Right, but just because you were able to identify, and I'm not even conceding that that is a less intrusive or more intrusive, was the impartial chairperson improper in saying discovery is one of the ways in which they're going to assess it? There's no least restrictive alternative or least burdensome standard that we are supposed to be implying, are we? Yes, so I think that where the arbitrator and then the district court erred is when we have decisions, core managerial decisions about the scope and direction of a business like a potential sale, a potential transfer. Right, but that's back into the assuming that your representation is correct and not letting them have the opportunity to test it. And then I think the harder question is how is the impartial chairperson or the union supposed to know that this is not a subterfuge, to use my colleague's language? So A, as I said, there are less intrusive means to test it. But B, in order to get there to see if they have that right to test, we have to apply the balancing test laid out in First National. We can't just ignore an on-point Supreme Court decision that is making this distinction. And that test here is that it's presumptively that these core managerial decisions are permissive. They're only mandatory if the benefit to labor management relations and the collective bargaining process outweighs the burden to the conduct of the business. But we haven't even reached the fact that this is a core managerial decision. We're just talking about information and data and discovery. Sure, but it's the topics upon which they've requested this information about that go to a decision. And what's maybe instructive for the court to look at is the Gibraltar case from the Sixth Circuit, where the Sixth Circuit actually overruled a decision from the National Labor Relations Board holding that an employer had to provide information. And there the court actually looked at the request. Are you asking this court to adopt a per se rule that one can never, like it will always be improper to ask questions or ask for documents about sale? Of course not. Are you asking us to do that? Of course not, no. Okay, then how do we know that we are in the land that is improper in this matter? And how do, more importantly, do they know and the impartial chairperson know? By applying the first national balancing test. Because if you apply it and there are the benefits in that situation, it's applied on a case-by-case basis. And so here we think that the burdens outweigh the benefit and that those RFIs should not have been determined to have been required to be produced. But to your point that not every sale, not every transfer, not every future alternative use for the hotel or a current version is necessarily going to be a permissive subject of bargaining. Although the way Justice Blackmun described in first national these core managerial decisions, he does basically sort of say that for some of them like this, it's presumptively permissive in that you only overcome that by applying the balancing test. Here the balancing test wasn't applied. And so in actually applying it, the union has not essentially posited any benefits here that outweigh the burdens to labor management relations. This strikes me as pretty simple. I'm just trying to figure out why you think it's more complicated. This is a situation where the arbitrator thought it was appropriate for the union to get information to figure out if you guys had already basically converted the hotel. Like that's what you were doing, you just hadn't told anybody. And so what sort of balancing test has to be conducted before an arbitrator can say, yeah, you've got to produce documents that will allow us to know whether or not you've triggered Article 57? Well, I think that comes down to this idea that the duty to produce documents stems from the duty to bargain in good faith. So all of these things about whether it's mandatory or permissive, that encompasses the duty to produce documents. And so you have a holding like in Gibraltar and in Reiling v. General Mills where the court is saying you don't have a duty to produce documents if you don't have a duty to bargain over that managerial decision in the first place. And by the award finding that we should have produced on those topics like a potential sale, like a potential transfer or future alternative uses, we have a situation where it is itself violating that distinction in the National Labor Relations Act between permissive and mandatory subjects. I guess, you know, the district court was very keen in this case to just simply say that this was a discovery violation. But you can't get to the decision that it's a discovery violation unless you first have a duty to produce documents, which you don't get to if we don't have a duty to bargain on that subject in the first place. The IC disagreed with you, right? I mean, look, I was a district judge. Because if somebody came in and didn't produce discovery because they thought it was overburdensome or they thought it was not appropriate, I guess they could say quash that subpoena. But if I said no, you've got to produce, they then would have to produce. And I would sanction them if they didn't. I guess I'd ultimately threaten a default. And so why doesn't the IC have the same authority in running an arbitration that a district court would have in a civil case? Well, just like, Your Honor, in a district court proceeding, there are limits to what you can require somebody to produce. And he did not abide by what those limits are and infringed on our right to decline to engage in bargaining on that subject. And further, Your Honor, does it not have to defer to the IC's finding there? When you look at – We don't have to. I mean, it's a pretty deferential standard of review. But we obviously don't have to. Sure, but those general principles about deference and finding, you know, any colorable justification, those are general principles of law that bow to the more specific rule here that an arbitration award cannot violate the National Labor Relations Act, which is what this court held in International Masters v. Trinidad. But what you're saying is that the order to produce these documents is what violated, I guess, the law and also violated the IWA, right? Yes, because the IWA can't go further than what's provided for in the National Labor Relations Act. And I guess where that case would come from was the Permalink case where this court – Okay, so – but again, you're saying then that the IC did not have the authority to order them to produce documents to see whether or not you guys were actually converting this hotel under the radar. Well, first, Your Honor, there's – the award itself is – you know, admits that they were seeking requests about what we were contemplating. Well, what you were contemplating at a point in time, I guess, to then determine whether or not you had already converted by the time you closed the thing. I mean, I'm not sure that you would lose by producing these documents. What you're saying is that they don't even have the authority to order you to produce the documents. Not on this topic. Certainly there are other topics, and there were 20 topics or 20 RFIs. Not all of them were about, you know, this impermissible – or imposing this permissive subject. By our count, we count nine out of the 20 at least that were on these permissive subjects. But it would be – you know, it would undermine First National, a Supreme Court decision, not to apply it in the situation where you have core managerial decisions at issues. And furthermore – But, I mean, if you had already converted the thing, if there's a secret deal that says, we're going to sell this thing and make it a residential condominium complex, that would be something they'd be entitled to have, right? Yes. However, in – you know, the union – it would be perhaps unwise, I think, to ignore First National and its balancing test whenever the union says we don't believe them, particularly when there are less intrusive means to test, and when they have an alternative remedy for enforcing their right to information, such that if we had actually withheld information from them because a decision had been made, and then they found out about it, and they have a remedy for that, it is itself an unfair labor practice. And so because this alternative remedy exists, you still have a permissive subject of bargaining. And I would analogize it to – So I think what you're saying then is that their less intrusive remedy is that they get to wait to see what ends up happening on the site, and if a year from now they start building, then they get a remedy, then they get to move to – under Article 57? I mean, that's a hypothetical situation. Again, like I said, if a deal ever really came out, of course there are going to be public announcements. You cannot hide the redevelopment of a major property like this in New York City. But you're saying it was improper for the arbitrator to say, produce what you've got now so we can figure out whether you already did this, which would then trigger Article 57, and then we can determine quickly and once and for all what are the severance payments owed to the employees of a closed hotel. It seems to me that this is pretty rational to do it this way. You keep saying there's a less intrusive way to do it, which would have everybody waiting a year and then just doing litigation at that point. Well, it's not necessarily a year. It's whenever a decision is actually made. Well, except you keep saying that, but they're worried that a decision has been made and that you're just delaying the construction to avoid having to pay severance to employees who would be entitled to a bump if that was the determination at the time of closure. Except that this award itself, by its language, admits that no decision had been made. It's about contemplating, and then he says that we were supposed to produce information so that the union could bargain about the future use of the hotel. That's a line straight from the award. And we don't have an obligation to bargain over the future use of the hotel, and that is why in so ordering it violates our rights. All right. Well, we've gone over, but I think appropriately we had questions. Judge Nardini, any questions from you? It's always tricky when you're remote. No, thank you. Okay. All right. Well, now we'll hear from Mr. Saltzman. Good morning, Your Honors. May I please reserve one moment, one minute at the end in case there's a need to rebut? No, that's not usually the way we do it, and I don't envision doing it here. If it's something I think where any of the judges feel it's necessary, then we can take that up. Very good, Your Honor. The decision of the district court should be affirmed because it meets all the law and policy principles promoting industrial peace and collective bargaining through the confirmation of labor arbitration awards. Nothing in the brief by the hotel or in oral argument today rises to the very high standard necessary to append those fundamental principles. Well, it seems to me that actually what the IC did here was give you less than what you're entitled to under the IWA. In other words, if the IC determines that there has, in fact, been a conversion and draws that conclusion from the adverse inference of they're not producing documents, then you're entitled under Article 57 and Article 52 to a lump sum payment, right? Correct. But what the IC did is say not a lump sum payment, instead it's installments on a weekly basis until you get to the amount that would be owed under Articles 57 and 52. That's correct. Why is that proper? Because he was confronted with a situation that the industry has confronted, never had before of catastrophic proportions, COVID-19. The industry was dealing with severance pay and how does that work in a situation where we don't know what's going to be happening. And that's precisely the issue, the mandate given to arbitrators to deal with issues that the parties didn't deal with, didn't conceive of. So your view is that the IC had the authority to amend Article 57 and Article 52 to stagger the payments? No. He construed those provisions. And there was a prior award of the office dealing with Article 15, dealing with severance, regular severance, which he cites, which we cite also in our brief, which said in the particular circumstances of COVID-19, which the parties would have wanted this to proceed. And then he construed, took that arbitration award, which, as the Supreme Court has indicated, becomes part of the contract. But so what's the decision? Are we in a situation where somebody could both be allowed to collect severance for both closure and conversion? You get Article 50. They actually were paid regular severance for regular severance, but 57 provides additional because of conversion. There's no way to come back when a place is converted, whereas under normal severance. But what I'm asking is do you think that Article 57 contemplates getting paid for both conversion and closure as opposed to one or the other? Yes. Under certain circumstances, it can do that. Why? Where's the text that tells me that that's permissible? Because under Article 57, under normal severance, people have the right to come back. And it extends. It's not wiped out by the severance award. That is the practice in the industry. But under conversion, there's nothing to come back to. And that's why there's an additional compensation to cushion the workers in the situation where they're not going to get their job. There's no chance of recall. They're landing in a difficult spot. Can you help me come up with a – well, first let me ask, do you believe that your colleagues on the other side are obligated to come up with what we might call negative evidence, like evidence showing that they are not going to sell, convert, or transfer? Like, do they have that obligation? They're obligated to produce all evidence that, as the NORB has stated, and that's the standard that's used. So what would you say to their argument, which, as I understand it, is that you are entitled to information after a decision has been made, but what you were doing is you were asking for that information before a decision has been made. Well, that's putting the employer in control of the union's obligation to find out what is happening on the ground and then enforce the contract, which is undisputed and untouched by First National, and bargain for effects, the effects of the situation. But where is the line then for us? Because we're going to have to write a piece of paper between when something is decisional and when it is effects bargaining. Documents can have many purposes, and in this case, the document may have dual purposes. If the document under the standard of broad discovery, and by the way, we cite the Crozer decision, the Third Circuit decision. There was a recent development in that case where the Third Circuit again confirmed that broad discovery standard against the employer. If the union has to wait to see what happens down the road, it's essentially putting the fox in charge of the henhouse and at the gate to the door. Rather, the correct standard is that if the information could be relevant to the dispute or, as the board put it in the U.S. Postal Service case that we cite, might be potentially relevant to deciding whether or not there is a grievance, then that should be produced. As your Honor put it, we don't know what they're doing. We're entitled to ask. They're obligated to answer. What they did was say, we are not answering as a matter of law. We don't have to, misconstruing, misusing First National. That's improper. The arbitrator saw through that. I appreciate that. What I'm asking is if you can help us figure out where the line becomes something that is effects bargaining and decisional bargaining. If the union was to say, we want documents because we want to question what you're doing. We want to tell you how you should do this. But we have a better idea that you should consider. Well, the first two sound kind of like what you asked for, right? What you're doing is the why we're here. So can you try and be a little more precise? Sure. I'll try. I'm sorry if I wasn't precise. Let's put it the other way, because it's a broad discovery standard. So it should sweep in and err on the side of inclusion. If the union is saying, we want to know what documents you have. We want to look at them. Because we want to know whether there's been a violation of Article 57. And as the judge pointed out, you just, you know, it takes a long time for these decisions to be implemented. The workers are going without pay and severance. So we want, we would like to see those documents to enforce the contract or to start bargaining with you regarding the effects. Then the documents should be produced. There's no harm in that production in that broad standard. Because if the union strays from its initial intent and purpose of request to say, well, now we want you to do this differently, the decision differently. Then that's the time for the hotel to stand and say. Okay, so you're basically saying that there's not really a, if I understand you correctly. And I'm trying to get it right, so help me if I've gotten it wrong. What I think you're trying to say is that there's no violation that can result from documents. It's more like what you do in the face of those documents. And at that point, the line becomes reasonably clear whether or not it's decisional or facts. Is that? Thank you for articulating the point I was struggling to make. I mean, the point is, I guess, if it's an overbroad request, then they get to object to the IC. Yes. And he has the final decision on that. That's the intent of the parties in establishing the forum. And if the concern is that it will include confidential information that could compromise their ability to make the types of decisions that are beyond the interests of the union, then there are steps that can be taken to keep it confidential or attorney's eyes only. This happens in arbitrations just like civil litigation, right? Exactly. The IC has a practice. And it's a regular matter for an employer to stay. We want this to be confidential. Or the union, if it has to deal with employees' personal information. So what's strange to me, I will say, Mr. Saltzman, is that this is sort of a hybrid order. It's both a discovery sanction and a final order on a conversion. There's quibbling over whether the language says converting as opposed to converted, putting that to one side. It seems like what the IC said is, in light of their non-performance on the documents, I will draw an adverse inference. I will, therefore, conclude on the basis of that adverse inference, since that's all I need to do with the basic preponderance. I'm going to conclude that there was a conversion and, therefore, you owe the full amount under Article 57 and 52. But I'll rescind all this if you produce the documents in the intro. And that seems unusual. I didn't find any situation like this. Certainly, a district court would never do it this way. Normally, you'd threaten a default, and then if they don't comply, then you'd do a default and explain it. So I'm not sure why this is even final if it's contingent. The district court correctly held that the arbitrator was not making a final decision. He was using the adverse inference to support the sanction that he ordered, so that the sanction was not sort of floating in free air, but was tied to Article 52, to the contract. And in doing so, he decided with finality, which is what Article 26 of the IWA requires. Can it really be final when we don't know the precise severance amount and we don't know what documents they're supposed to produce? The issue that needed to be decided finally for the parties to proceed to anything else was whether they were obligated to produce documents. Most of the oral argument and most of the brief that they filed here in district court and to the arbitrator was we have no obligation to produce anything to this union. And until that threshold issue was decided finally by the arbitrator, the parties could not proceed to anything else. This would constantly be a refrain that would undermine the ability of the arbitrator. This is what the IC said. He said the union has established a prima facie case that the hotel was converting. I know that's language that's being quibbled with, but as opposed to has converted the hotel to residential use. Absent any rebuttal evidence from the hotel, I'm compelled to draw an adverse inference that the hotel violated Article 57. Accordingly, I order them to pay the severance provided for in Article 57. That sure looks like a finding that they've converted. And then with a reconsideration clause built into it that says if they now produce the documents, then they'll get to rebut that prima facie case all over again. I think it's not what he did. What he did was say I need, I think I'm going to, I am going to be imposing sanctions. I do not want that to be in free air. I have a prima facie case that there was a violation of Article 57, and that supports the sanction obligation. You can rebut that sanction. There's no decision. So you're saying that there's a contemplation of an additional hearing after this one to determine whether or not they converted? There will be because we need the evidence of whether or not there was an actual conversion. Well, they're not producing the evidence, right? And so that, well, the absence of evidence is allowing the IC to draw an adverse inference, which then is all there is. That would be sort of a McDonnell Douglas kind of standard to parallel it. But that isn't what he did. He may well have been able to do that, but the arbitrated office tries to navigate for both. It's established by both employers and the union, and it tries to navigate both and give them the opportunity, since they've made the mistake of not producing, egregious as it was, give them the opportunity to rebut the sanction, to undo the sanction, and produce the evidence which will allow the union to do its job. But what happens if they don't produce the documents for weeks and months and longer, and then you hit the ceiling of what is the severance amount? Then Your Honor's point may well be correct in terms of what the arbitrators should do. Well, does the arbitrator have to do anything at that point? Your clients have already received all the severance money. Well, if they've received the severance as a sanction, I think the union would go back and say, we'd like to convert that sanction into a final decision because they've not produced anything and there's nothing left to do except perhaps ignore the IWA and ignore their violation, and that can't possibly be what the parties contemplated in such a comprehensive contract. So why is it necessary to make any adverse inference at all for a discovery sanction? The only thing you need to do for a discovery sanction is say, you're not producing $1,000 a day for the first week, it'll be $10,000 a day for the second week, and then the third week it'll be a default judgment. Did the IC have that authority? He certainly could have done that, but he chose not to. So why is it necessary to draw an adverse inference in imposing discovery sanctions? Because he wanted to – because he's sensitive to the fact that he was imposing a sanction, he wanted – I'm construing, I'm reading what his word said and reading into it, I think, because he doesn't explain that verbatim, but in imposing a very substantial, serious sanction in a novel situation, the arbitrator wanted to ground his award as he had to in Article 57, and he did so by saying a prima facie case has been met. That's exactly what the district court found and held. All right. May I just conclude with the words of Justice Sotomayor, which we quote and cite in our brief. In a decision from the early 90s, she set the pattern for the impartial chairman's office by reminding the parties that that's the office that has the wisdom and applies the wisdom to give the parties a final and definite decision on all their disputes. And she didn't say it, but in hindsight we see it. It's also the rule that is behind the prosperity of this industry through ups and downs, through disasters made by man or nature. Whatever may come, this industry comes back. It is coming back. The arbitrator applied that wisdom in his award. The district court confirmed it. This court should affirm. And finally, it's high time for the workers of the Roosevelt to be touched by that wisdom. They've been known layoffs and they're waiting. Thank you. All right. Thank you. Ms. Carey, you have two minutes of rebuttal. Okay. I'd like to come back to a statement from opposing counsel where he said that we were not answering them. Okay. These RFIs were issued. Every single one of them was responded to in writing where we said, in part, that you're not entitled to this information, okay, that it was premature because no decision had been made. So it is incorrect to say that we just weren't telling them and therefore they had the ability to infer we were hiding something from them. And secondly, you know, we had people testify under oath that no decision had been made about the hotel. The IC never made a finding that those people were not credible. Instead, he found that what they testified showed that there were documents responsive to their requests. We never said that there weren't any documents that were responsive to their requests. We said that they weren't entitled to them. I'm sorry. So is this going to your argument that they exceeded the authority? I'm just trying to figure out how to, what do I, what's the impact of what it is that you're. So I should have had a better opening that this kind of goes to Justice Sullivan's questions about testing and whether or not they had the right to test because they believe that, you know, something was going to happen, fly under the radar, and a decision would be made without us having the obligation to tell them. So is this more to the public policy that. . . Yes, this is about the public policy argument. As opposed to the exceeding authority. Correct. Okay. So we had people testify under oath that no documents existed and that, and he did not find that those people weren't credible. Rather, he found that documents. . . Rather, he found that documents existed that went to the RFIs. But we never said documents didn't exist. We said they weren't entitled to these documents in the first place because they're about us. But he found that they were relevant to impact bargaining and the union's investigation of the hotels related and affiliated entities and violations of Article 57 and 59. The IC found that this was relevant and they were entitled to it. You disagree with it, but that's what the IC found, right? So his, you know, he found that they were relevant and he said because they are for impact bargaining. The standard when judging whether an award violates the public policy is that the award itself, as opposed to its reasoning, has to conflict with the public policy, and that comes from the district vicinity case and the Niagara Mohawk case. So him saying because it's for impact bargaining, that goes to the reasoning. That's not the finding. That goes to the reasoning, not the finding? He said that these are relevant documents that go to what's within the scope of the IWA. I mean, it doesn't cite cases, I guess, but that's the finding of the IC. My reading of that is that it's his, that, well, yes, he found them relevant, but we, even if documents may be relevant, they are not entitled to them if they go to a permissive subject of bargaining, and that's the point of First National and why Justice Blackmun tried to set a line between the rights of labor versus the rights of an employer, and so it is really only if an employer and a manager and an owner has the freedom to decide the future scope and direction of their businesses without potential union interference, and that's why he created this test, and that's why we have a distinction between mandatory and permissive subjects of bargaining. So, yes, things may be relevant, but this overriding rule of law in First National sort of governs then whether or not that documents actually have to be produced. Well, it seems to me they're relevant to the topics that are covered within the scope of the IWA. Well, again, like I said, there are 20 of them, but most of them go to this permissive subject of bargaining, a potential sale, a potential conversion, potential transfer. So it goes to whether there's been a violation of Article 57. That's exactly what the IC said. I mean, you may disagree with it, but I'm not sure that your remedy then is to just not produce and not have any consequences for not producing. Well, you only get to a discovery sanction in the first place if we had this obligation to produce. No, no. The IC has told you, has ruled against you and says you've got to produce. So, I mean, in a court setting, I mean, you could try to appeal that decision, but, I mean, you first just decided not to produce and continue not producing for over a year, right? I mean, it seemed like this was a strategic play to say to the IC, we're not doing it and there's not much you can do about it, sort of doubling down on this. But in any event, your argument is that you didn't need to comply, notwithstanding what the IC said, because the IC didn't engage in a balancing test that it should have, right? Yes, but it's somewhat more nuanced, right? It's that there are these distinctions between permissive and mandatory subjects. By ordering, by finding that we violated a duty to produce on certain of those topics and then ordering us to produce on those topics that are permissive, it violates our right to decline to engage in bargaining. But he disagreed with you about that. He said that this went to violations of Article 57. A violation of Article 57 is clearly something that is within the scope of this arbitration, right? Are there some violations of Article 57 that are beyond the scope of this arbitration? No. So that's what the IC found, right? Yes, I mean, he does say that the union established a prima facie case of violation of Article 57, and that, of course, goes to our reason that he exceeded the scope of his authority on that point when the remedy he then imposed for that did not strictly follow what Article 57 provides for. And so for that reason, the award should be vacated as well, Your Honor. All right. Well, let me just see if my colleagues have any questions. We've gone over, but look, this is an interesting issue and one that is important, so we have license to do that. So we will reserve decision. Thank you both. Thank you, Your Honor. Have a good day. You too.